IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-00687-BO

| | |
|---|---|
| **Mark Eugene Daughtridge,**<br><br>                   Plaintiff,<br><br>v.<br><br>**Commissioner of Social Security,**<br><br>                   Defendant. | **Memorandum & Recommendation** |

Plaintiff Mark Eugene Daughtridge instituted this action on July 20, 2016, to challenge the denial of his application for social security income. Daughtridge claims that Administrative Law Judge Larry A. Miller erred in his determination by failing to consider the entire medical record and all of Daughtridge's impairments, focusing instead on the consultative examiners' reports. He also contends that ALJ Miller did not evaluate another disability rating by a different agency. Daughtridge has filed a Motion to Reverse the Decision of the Commissioner of SSA (D.E. 15) and Defendant Nancy A. Berryhill,[1] the Acting Commissioner of Social Security, has filed a Motion for Judgment on the Pleadings (D.E. 19).

After reviewing the parties' arguments, the court has determined that ALJ Miller reached the appropriate decision. ALJ Miller appropriately evaluated all the medical evidence in the record, and his consideration of the consultative examiners' reports and findings was proper. Additionally, his decision reflects that he did not err in his review of the Veterans Administration ("VA")

---

[1] Berryhill replaced Carolyn Colvin as the Acting Commissioner of Social Security on January 20, 2017.

disability rating. Therefore, the undersigned magistrate judge recommends that the court deny Daughtridge's motion, grant the Commissioner's motion, and affirm ALJ Miller's decision.[2]

## I. Background

On December 7, 2009, Daughtridge filed an application for disability benefits. In a determination dated January 25, 2010, Daughtridge was found disabled as of November 1, 2008. His disability was determined to have continued in a subsequent determination dated August 26, 2011.

On January 6, 2015, the Social Security Administration found that Daughtridge was no longer disabled as of January 7, 2015. This determination was upheld upon reconsideration. Daughtridge appeared before ALJ Miller for a hearing to determine whether he was entitled to benefits. After the hearing, ALJ Miller determined that Daughtridge was not entitled to benefits because his previously-determined disability ended on January 7, 2015. Tr. at 11–22.

ALJ Miller found that, at the time of the previous decision,[3] Daughtridge had the following severe impairment: left ankle fracture. *Id.* at 13. This impairment met Listing 1.06AB of the Listing of Impairments. *Id.* ALJ Miller also determined that, as of January 7, 2015, Daughtridge had the following severe impairments: cervical and lumbar degenerative disc disease, history of torn meniscus of the right knee, status post left ankle fusion surgery, depressive disorder, cognitive disorder, and post-traumatic stress disorder ("PTSD"). *Id.* ALJ Miller also found that these impairments, either alone or in combination, did not meet or equal a Listing impairment. *Id.* He concluded that medical improvement in Daughtridge's condition occurred as of January 7, 2015. *Id.* at 14.

---

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b). D.E. 16.

[3] This is known as the comparison point decision ("CPD").

ALJ Miller then determined that Daughtridge had the RFC to perform light work with limitations. *Id.* at 15. Daughtridge can occasionally balance on narrow, slippery, or moving surfaces. *Id.* He can occasionally climb, stoop, crouch, kneel, or crawl. *Id.* Daughtridge is limited to performing simple, routine, repetitive tasks (i.e. he can apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations). *Id.* He is able to concentrate for two-hour increments with normal rest breaks. *Id.* Daughtridge can occasionally deal with co-workers, supervisors, and the public. *Id.* However, he would not be able to work at jobs requiring complex decision-making, constant change, or dealing with crisis situations. *Id.*

ALJ Miller also concluded that Daughtridge was unable to perform his past work as a military police officer. *Id.* at 20. ALJ Miller found that, considering his age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he was capable of performing. *Id.* at 20–21. These included: office helper, mail sorter, and marker. *Id.* at 21. Thus, ALJ Miller found that Daughtridge was not disabled. *Id.* at 22.

After unsuccessfully seeking review by the Appeals Council, Daughtridge commenced this action on June 4, 2015. D.E. 4.

## II.    Analysis

### A.    Liberal Construction of Pro Se Pleadings

Daughtridge brought this action pro se, which requires the court to liberally construe his pleadings. *Estelle* v. *Gamble*, 429 U.S. 97, 106 (1976); *Haines* v. *Kerner*, 404 U.S. 519, 520 (1972) (per curiam); *Loe* v. *Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978*); Gordon* v. *Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). Pro se pleadings are held to a less stringent standard than those drafted by attorneys. *Haines,* 404 U.S. at 520. Even under this less stringent standard, however, a pro se

complaint is still subject to summary dismissal. *Id.* at 520–21. The mandated liberal construction means only that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. *Barnett* v. *Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). A court may not construct the plaintiff's legal arguments for him. *Small* v. *Endicott*, 998 F.2d 411, 417–18 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." *Beaudett* v. *City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

### B.    Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### C.    Standard for Evaluating Disability

To qualify for disability benefits, a claimant must show that he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). In a typical social security case, where the issue is whether a claimant is disabled and should therefore be granted Social Security benefits in the first place, the Commissioner (through an ALJ) applies a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010). Once a claimant is

found disabled under the Social Security Act, a presumption of continuing disability arises. *See Bellamy* v. *Sec'y of Health & Human Servs.*, 755 F.2d 1380, 1381 (9th Cir. 1985) (citation omitted). The Secretary may not terminate benefits unless substantial evidence demonstrates sufficient medical improvement in a claimant's impairment that the claimant becomes able to engage in substantial gainful activity. *See* 42 U.S.C. § 1382c(a)(4)(A); 42 U.S.C. § 423(f); 20 C.F.R. §§ 404.1594, 416.994.

In assessing whether a claimant continues to be disabled, an ALJ must follow an eight-step sequential evaluation process for disability insurance benefits ("DIB") claims and a seven-step process for supplemental security income ("SSI") claims.[4]

(1)     Is the claimant presently engaged in substantial gainful activity? If so, and any applicable trial work period has been completed, the claimant's disability ends. If not, proceed to step two.

(2)     Does the claimant have an impairment, or combination of impairments, which meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant's disability continues. If not, proceed to step three.

(3)     Has there been medical improvement as shown by a decrease in the medical severity of the impairment(s) present at the time of the CPD? If so, proceed to step four. If not, proceed to step five.

(4)     Was any medical improvement related to the ability to work (i.e., has there been an increase in the claimant's residual functional capacity)? If so, proceed to step six. If not, proceed to step five.

(5)     Is there an exception to medical improvement? If not, the claimant's disability continues. If an exception from the first group of exceptions to medical improvement applies (i.e., substantial evidence shows that the claimant has benefitted from "advances in medical or vocational therapy or technology" or "undergone vocational therapy" if either is "related to [the] ability to work"), see 20 C.F.R. §§ 404.1594(d) & 416.994(b) (3), proceed to step six. If an exception from the second group applies (i.e., disability determination was fraudulently obtained, claimant was uncooperative,

---

[4] These evaluation processes are materially identical except for the first step, which applies to disability insurance benefits claims only.

unable to be found, or failed to follow prescribed treatment), see 20 C.F.R. §§ 404.1594(e) & 416.994(b)(4), the claimant's disability ends.

(6) Is the claimant's current combination of impairments severe? If so, proceed to step seven. If not, the claimant's disability ends.

(7) Does the claimant possess the residual functional capacity to perform claimant's past relevant work? If so, the claimant's disability ends. If not, proceed to step eight.

(8) Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow the claimant to do other work? If so, the claimant's disability ends. If not, the claimant's disability continues.

20 C.F.R. §§ 404.1594(f), 416.994(b)(5). Although the claimant retains the burden to prove disability, the Commissioner has the burden to produce evidence to meet or rebut the presumption of continuing disability. *Bellamy*, 755 F.2d at 1381 (citation omitted).

### C. Medical Background

ALJ Miller offered a comprehensive summary of Daughtridge's relevant medical history in his determination. *Id.* at 13–20. He noted Daughtridge has a history of chronic back and neck pain due to degenerative disc disease, right knee pain from chondromalacia, fracture and residual osteomyletitis of the ankle, depressive disorder, and PTSD. *Id.* at 16. Daughtridge testified that he had difficulty with prolonged standing and postural activities, he developed back spasms when performing household chores, and his pain medication knocked him out. *Id.* He also experienced memory loss. *Id.*

A Third Party Function Report from Daughtridge's wife noted that he was mostly sedentary due to his back pain and medication side effects. *Id.* Her report also noted that Daughtridge was independent with self-care, he performed some household chores, and he socialized with friend via computer. *Id.* She also remarked that he had several limitations with postural activities as well as difficulty with remembering, concentrating, and understanding. *Id.*

6

An August 2012 psychological assessment noted that Daughtridge walked without an assistive device and that he had normal speech, calm mood, and intact cognition. *Id.* The assessor diagnosed PTSD and depressive disorder. *Id.*

A November 2013 physical evaluation showed some small effusion of the right knee but no edema or swelling. *Id.* Providers prescribed medications for his pain. *Id.* at 16–17. The following month, Daughtridge reported memory loss and received a referral to speech pathology due to his traumatic brain injury ("TBI").[5] *Id.* at 17.

An April 2014 x-ray of Daughtridge's right knee showed chondromalacia but no patellofemoral abnormalities. *Id.* Daughtridge declined an injection noting that he had not recently experienced a flare-up. *Id.* The following month, Daughtridge underwent a physical therapy evaluation for his right knee pain. *Id.* He reported memory loss and acknowledged that his ankle felt good and he wanted to start running again. *Id.* Daughtridge declined physical therapy services. *Id.*

In November 2014, Dr. Constant Masere performed a consultative examination. *Id.* Daughtridge reported neck, back, and left ankle pain, as well as memory loss stemming from his TBI. *Id.* He asserted that he could stand for 30 minutes and sit for 20 minutes, he could only walk short distances, and he could not carry much weight. *Id.* Examination showed only a slight decrease in strength in the left ankle, normal sensation, negative straight leg raise, good concentration, normal memory, and appropriate mood. *Id.* He displayed some difficulty getting up from the exam table and with heel and toe walking. *Id.* Dr. Masere opined that Daughtridge could sit normally

---

[5] Daughtridge takes issue with ALJ Miller's failure to recognize his TBI as a severe impairment. However, inasmuch as it is not a diagnosis but the functional effects of a condition that inform a disability determination. Here, ALJ Miller noted that Daughtridge complained of memory loss, providers assessed a mild neurocognitive disorder due to the TBI. Tr. at 17. Thus, while he may not have addressed the cause (TBI) ALJ Miller sufficiently accounted for the result (mild neurocognitive disorder) and its effect (memory loss).

during an eight hour workday with normal breaks but he would have moderate limitations with standing and walking as well as lifting and carrying. *Id.* Dr. Masere further determined that Daughtridge would be limited to only occasional postural activities. *Id.*

That same month, Dr. Christopher Ricci performed a psychological consultative examination of Daughtridge. *Id.* He reported that Daughtridge had a history of TBI, he was independent in self-care, he performed some household chores such as cooking and washing dishes, and he socialized with friends. *Id.* Dr. Ricci found that Daughtridge had good attention and concentration as he was able to recall and understand instructions. *Id.* He noted a full-scale IQ score of 89 and a below-average visual working memory score of 85. *Id.* Dr. Ricci opined that Daughtridge had a mild neurocognitive disorder due to his TBI. He concluded that Daughtridge would be able to understand and follow simple instructions, perform simple tasks independently, and make appropriate decisions. *Id.* at 17–18. Dr. Ricci further found that he could maintain basic attention and a regular schedule, relate adequately to others, and deal with the stress of daily work tasks. *Id.*

February 2015 imaging tests of Daughtridge's spine showed minimal degenerative changes with no evidence of spinal canal stenosis. *Id.* at 18. Daughtridge remarked that his left ankle was "doing great," and the medical records note that he had a normal gait and full motor strength. *Id.*

Dr. Gary Bachara performed a psychological consultative exam in April 2015. *Id.* Although he noted memory loss, Daughtridge could not describe his PTSD symptoms. *Id.* Mental status examination revealed intact memory but some difficulty with delayed recall. Dr. Bachara assessed a somatic symptoms disorder. *Id.* He opined that Daughtridge could understand, retain, and follow instructions, he could get along with others, and he was capable of performing simple, routine, repetitive tasks. *Id.*

Dr. Satish Kumar performed a physical consultative examination the following month. Daughtridge reported intermittent back pain, right knee pain, and occasional left ankle pain. *Id.* He acknowledged he was able to drive, dress, cook, clean, and bathe. *Id.* Daughtridge estimated that he could stand for 10 minutes, sit for 30 minutes, and walk one half mile. *Id.* Dr. Kumar's examination showed full strength and sensation with limited range of motion in the left ankle. *Id.* X-rays demonstrated mild arthropathy in the right knee and mild degenerative changes in the lumbar spine. *Id.*

The record also contained evidence from the Veterans Affairs Department. *Id.* A January 2016 medical report noted Daughtridge's chronic back pain, PTSD, mild cognitive disorder, osteomyelitis, chondromalacia of the patella, depressive disorder, and degenerative disc disease. *Id.* Daughtridge complained of memory loss and pain, although he reported walking more than a mile every day. *Id.* Examination notes indicated decreased range of motion in the left leg, negative straight leg raise, and a mildly depressed affect. *Id.* The VA found Daughtridge had a 70% service related disability rating beginning in December 2009.[6]

### D.  Evidence Considered

Daughtridge makes a general objection to ALJ Miller's evaluation of the evidence, contending that Miller did not consider several years of records and testing from the VA. The Commissioner is correct in arguing that ALJ Miller properly considered all relevant evidence.

The Regulations require the Commissioner to consider all the evidence in a claimant's case in making a disability determination. *See* 20 CFR §§ 404.1520(a)(3), 416.920(a)(3). ALJ Miller noted in his decision that he considered all the evidence in the record. Tr. at 11, 12, 16. Absent

---

[6] Daughtridge remarks that this evidence was not included as part of the transcript. A review of the Administrative Record demonstrates that the VA Ratings Decision is, in fact, included. *See* tr. at 170–75, Ex. 2D.

evidence to the contrary, these statements are reliable and should be accepted. *See Reid* v. *Comm'r Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word.") (citation omitted).

The VA medical records Daughtridge asserts were overlooked are included in the Administrative Record. Tr. at 170–75 (Ex. 2D); 341–436 (Ex. 2F); 437–78 (Ex. 3F); 561–653 (Ex. 16F). ALJ Miller specifically cited to these records in his decision. *Id.* at 13–18. Clearly, then, ALJ Miller considered this evidence in rendering his disability determination. It bears noting that an ALJ is not required to discuss every piece of evidence. *Brewer* v. *Astrue*, No. 7:07-cv-24, 2008 WL 4682185 at *3 (E.D.N.C. Oct. 21, 2008) ("While the ALJ must evaluate all of the evidence in the case record, the ALJ is not required to comment in the decision on every piece of evidence in the record, and the ALJ's failure to discuss a specific piece of evidence is not an indication that the evidence was not considered."). Accordingly, the court finds that the VA records were appropriately considered.

Moreover, Daughtridge's prior disability finding by the SSA found his left ankle fracture met Listing 1.06AB, rendering him disabled. Tr. at 12–13. As on January 2015, however, this condition had improved and Daughtridge's ankle fracture no longer met the requirements of Listing 1.06AB. As ALJ Miler noted in his decision, the medical record demonstrated improvement in this condition. ALJ Miller cited Daughtridge's 2008 surgery, the 2011 surgery for hardware removal and ankle fusion, reports from Daughtridge in 2012 noting considerable improvement in his ankle, imaging tests revealed the ankle's fusion was solid in 2012, Daughtridge's report to providers in 2014 that he had no residual ankle discomfort and wanted to pursue running, and exam findings noting steady gait and only minimal decrease in ankle strength.

*Id.* at 14–15, 17–19. ALJ Miller observed that Daughtridge did not require an assistive device to ambulate; after his surgeries, he received conservative treatments for his ankle; and in February 2015 he stated that his ankle was "doing great." *Id.* at 18–19. These findings constitute substantial evidence supporting ALJ Miller's determination that Daughtridge's left-ankle impairment, upon which his prior SSA disability finding was based, had sufficiently improved so that it no longer rendered him disabled under the Regulations.

Daughtridge also makes specific arguments against the medical evidence from consultative examiners, discussed more fully below.

### 1. Dr. Masere

Daughtridge asserts Dr. Masere's assessment contained several errors. He maintains that Dr. Masere failed to note his irregular heartbeat; that he attributed all of Daughtridge's injuries to a mortar explosion, which only caused the TBI; and he failed to note Daughtridge's lifestyle changes were only partially successful at relieving his pain. The Commissioner avers that ALJ Miller properly considered the evidence from Dr. Masere.

Daughtridge notes a history of cardiovascular issues. Pl's Mot. to Reverse Comm'r at 2, D.E. 15. He states that he was diagnosed with an irregular heartbeat. *Id.* As a result of this condition, he contends "monitors usually will not read my heart rate" which "usually has to be read by hand." *Id.* He further asserts that his chronic pain had been managed, with moderate success, by limiting his activities. *Id.*

However, as the Commissioner points out, Daughtridge did not raise any issues with Dr. Masere's report at his hearing before ALJ Miller when he was represented by counsel. Nor has he made a showing that there is new evidence which is material and for which good cause exists for failing to previously incorporate it into the record.

Although Dr. Masere examined Daughtridge only one time, he is a physician who is qualified to perform consultative examinations. 20 C.F.R. § 404.1519g(a), (b) (noting that SSA will obtain consultative exam from qualified medical source with current license and the training and experience to perform the type of exam sought). Additionally, ALJ Miller accurately summarized Dr. Masere's report. Tr. at 17. As required of all medical opinions, ALJ Miller weighed Dr. Masere's findings and accorded them some weight. *Id.* at 20. ALJ Miller noted that Dr. Masere's assessment was corroborated by his own clinical exam which found steady gait, normal sensation, and only a slight decrease in strength in the left ankle.

While Daughtridge may disagree with the SSA's use of consultative examinations, he has not shown that ALJ Miller erred in evaluating of Dr. Masere's findings. While he may not find such assessments probative, they must be considered by the ALJ. Accordingly, his argument on this issue is without merit.

### 2. Dr. Ricci

Daughtridge also contends that the written and verbal tests Dr. Ricci used to evaluate his PTSD and the effects of his TBI were unreliable because certain days he experiences more pain which impairs his ability to focus and to deal with people. He asserts that his physical injuries affect his mental abilities depending on the level of pain and his ability to manage it.

As with Dr. Masere's examination, Dr. Ricci's assessment is not rendered unreliable because he evaluated Daughtridge only one time. ALJ Miller accurately summarized Dr. Ricci's evaluation, which included a medical history, his observations, Daughtridge's mental status and daily activities, an IQ test, and Dr. Ricci's impressions and conclusions. Tr. at 17–18. As he is required to do for all medical opinions, ALJ Miller weighed Dr. Ricci's assessment, assigning it moderate weight. *Id.* at 20. ALJ Miller noted that Dr. Ricci properly accounted for Daughtridge's

memory impairment and limited him to simple, routine, repetitive tasks. *Id.* However, ALJ Miller found that Daughtridge's limitations in social interactions, based on his testimony and occasional depressed affect upon exam, warranted greater limitations than Dr. Ricci found. *Id.*

Again, Daughtridge's arguments amounts to disagreement, not error, in the consideration of Dr. Ricci's assessment. This fails to present a sufficient basis for remand.

### 3. Dr. Bachara

Daughtridge next claims that Dr. Bachara's report is vague and inaccurate, as it presents only a snapshot of his condition. He further contends that Dr. Bachara appeared agitated and depressed and his examination was very brief. Daughtridge also remarks that Dr. Bachara received information from the Agency, as his report included information that was not discussed during the exam.

As with the other consultative examiners' reports, ALJ Miller accurately summarized Dr. Bachara's assessment. Tr. at 18. ALJ Miller gave Dr. Bachara's opinion some weight. *Id.* at 20. While Dr. Bachara found that Daughtridge could understand, retain, and follow simple instructions; could perform simple, routine, repetitive tasks; and could get along with others, ALJ Miller concluded that Daughtridge had more limitations in social functioning than this examiner found. *Id.* at 18, 20.

Although he claims it is vague and inaccurate, Daughtridge has not identified specific errors in Dr. Bachara's report. Daughtridge has failed to demonstrate how the length of the examination or the assessor's disposition is relevant to the evaluation of his findings. His argument, like that for Drs. Masere and Ricci, amounts to disagreement with the assessor's opinion, not error. Because this is not a sufficient basis to warrant remand, Daughtridge's claim on this issue should be rejected.

### 4.    Dr. Kumar

Daughtridge also criticizes Dr. Kumar's assessment as benign and inaccurate. He contends that Dr. Kumar failed to note his irregular heartbeat, although he remarked on it during the exam. Daughtridge also faults Dr. Kumar for using a checklist and for failing to assess Daughtridge's ability to perform recreational or vocational tasks.

As with the other consultative examinations, the Commissioner asserts that ALJ Miller correctly summarized Dr. Kumar's findings. Tr. at 18. Daughtridge has not identified any error in Dr. Kumar's assessment. While he contends that Dr. Kumar omitted reference to his irregular heartbeat, Daughtridge fails to offer make any allegations, or offer any evidence, of the alleged functional limitations that result from this condition. It is a claimant's burden to establish disability. *See Emrich* v. *Colvin*, 90 F. Supp. 3d 480, 483 (M.D.N.C. 2015) ("A claimant for disability benefits bears the burden of proving a disability.") (quoting *Hall* v. *Harris*, 658 F.2d 260, 264 (4th Cir. 1981)). Accordingly, any omission by Dr. Kumar appears harmless and immaterial to the disability evaluation.

Because Daughtridge's arguments concerning Dr. Kumar's assessment amounts to dispute rather than error, it does not support a basis to remand this matter.

### E.    Veterans Administration Disability Rating

Daughtridge next argues that ALJ Miller failed to consider the VA Disability Rating. The determination found that Daughtridge had a 70% combined service rating deeming him totally and permanently disabled as of December 2009. Tr. at 170–75. The Commissioner contends correctly, that although it is relevant, the VA determination does not establish that Daughtridge disabled under the SSA guidelines.

As provided in 20 C.F.R. § 404.1504 and further explained in Social Security Ruling 06–03p, "a determination made by another agency that [the claimant is] disabled or blind is not binding on" the Social Security Administration. 20 C.F.R. § 404.1504. Rather, "the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner." SSR 06–03p.

The Fourth Circuit has addressed the value of disability findings by other agencies, noting that while not binding on the SSA, "another agency's disability determination cannot be ignored and must be considered." *Bird* v. *Comm'r of Soc. Sec Admin.,* 699 F.3d 337, 343 (4th Cir. 2012). In considering the weight to give a decision of the Veterans Administration ("VA") in particular, the Fourth Circuit held:

> The assignment of at least some weight to a VA disability determination reflects the fact that both the VA and Social Security programs serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims.

*Bird*, 699 F.3d at 343 (internal quotations omitted). The Fourth Circuit therefore concluded that "in making a disability determination, the SSA must give substantial weight to a VA disability rating," but that "an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate." *Id.*

Here, the VA found that Daughtridge had a combined service disability rating of 70% related to conditions including his PTSD, right knee, and back. *Id.* at 171–72. The PTSD represented a rating of 50% disabled. *Id.* at 171. Citing *Bird*, ALJ Miller gave the VA disability rating moderate weight, noting that Daughtridge required medications for his PTSD and objective imaging confirmed his left ankle, right knee, and back conditions. *Id.* at 19. ALJ Miller noted,

however, that the rating was based primarily on Daughtridge's PTSD, which did not appear to be a significant factor during the period in question. *Id.* He further remarked that the VA rating system for evaluating disability differed from the SSA model and the VA approach did not determine Daughtridge's overall functional capacity. *Id.* at 19–20. These reasons clearly demonstrate why ALJ Miller found the VA rating did not warrant greater weigh, thus complying with the requirements of *Bird.* Accordingly, remand is not warranted on this issue.

  **F.**  **Daughtridge's Employability**

  Finally, Daughtridge contends that he is disabled because a reasonable employer would not hire someone with his profile. The Commissioner correctly asserts that whether a claimant would actually be hired cannot be considered in the disability analysis.

  The Regulations address an inability to obtain employment under 20 C.F.R. § 404.1566(c), which provides:

> We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of—
>
> (1) Your inability to get work;
>
> (2) Lack of work in your local area;
>
> (3) The hiring practices of employers;
>
> (4) Technological changes in the industry in which you have worked;
>
> (5) Cyclical economic conditions;
>
> (6) No job openings for you;
>
> (7) You would not actually be hired to do work you could otherwise do; or
>
> (8) You do not wish to do a particular type of work.

20 C.F.R. § 404.1566(c); *see also Olson* v. *Schweiker*, 663 F.2d 593 (5th Cir. 1981) (disability inquiry is not whether claimant is able to obtain work but whether he is able to engage in any vocation); *Cook on Behalf of Cook* v. *Sullivan*, 812 F. Supp. 893 (C.D. Ill. 1993) (economic conditions, personal factors, and attitudes of employers are irrelevant in determining whether claimant is disabled).

In conducting the continuing disability evaluation, ALJ Miller did not address whether an employer would extend an offer of employment to him. Instead, ALJ Miller properly limited his analysis to whether work exists that Daughtridge is capable of performing given his RFC, age, education, and past work experience. Although Daughtridge claims that he is unlikely to be employed given his profile, as noted above, such a factor is irrelevant to the disability inquiry where an ALJ determines that a claimant's RFC and vocational abilities make it possible for him to do work that exists in the national economy. Accordingly, Daughtridge's argument on this issue lacks merit and should be rejected.

## III. Conclusion

For the forgoing reasons, undersigned recommends that the court deny Daughtridge's Motion to Reverse the Decision of the Commissioner (D.E. 15), grant Berryhill's Motion for Judgment on the Pleadings (D.E. 19), and affirm the Commissioner's decision.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel. Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the

determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Owen* v. *Collins*, **766 F.2d 841, 846–47 (4th Cir. 1985).**

Dated: May 18, 2017

_____
Robert T. Numbers, II
United States Magistrate Judge